Earle W. KELLY, et al., Plaintiffs,

v.

LOCKHEED MARTIN SERVICES
GROUP, et al., Defendants.

No. Civ. 97–2265(DRD).

United States District Court,
D. Puerto Rico.

Aug. 31, 1998.

Roberto Lefranc-Romero, Santurce, PR, for Plaintiffs.

Alcides A. Reyes-Gilestra, Schuster Usera Aguilo & Santiago, San Juan, PR, for Defendants.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Pending before the Court is Defendants Lockheed Martin Services Group, Lockheed Martin Corp., and Martin Marietta Services, Inc.'s [1] (Defendants') motion to dismiss. (Docket No. 14.) Plaintiffs oppose Defendants' motion. (Docket No. 19.) Plaintiff Earle Kelly brings his claims under the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.;* Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a; the Federal Rehabilitation Act of 1973, 29 U.S.C. § 793; Law No. 44, 1 L.P.R.A. § 501 *et seq.,* 31 L.P.R.A. § 5141; the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et seq.;* and Law No. 100 of June 30, 1959, as amended, 29 L.P.R.A. §§ 146–151. (Complaint, ¶ 2.) Plaintiff's wife Paige Kelly alleges that she has suffered mental anguish and emotional distress because of the discrimination allegedly suffered by Plaintiff Earle Kelly.

---

1. Mr. Kelly was first employed by Martin Marietta Services, Inc. In March 1995, Lockheed merged or combined with Martin Marietta within the Lockheed Martin corporation, which had been formed in 1994. As the corporate identity of Defendants does not affect this motion, the Court will not endeavor to trace the exact corporate history of these entities.

(Complaint, ¶ 57.) The conjugal partnership formed by Mr. Earle Kelly and Mrs. Paige Kelly brings a cause of action for economic loss and lost profit because of the discrimination allegedly suffered by Mr. Kelly. (Complaint, ¶ 55.) For the reasons discussed below, the Court grants Defendants' motion, which requests dismissal of all of Plaintiffs' Puerto Rico claims and ADEA claims, all of Paige Kelly's claims, and all of the conjugal partnership's claims.

## I. Factual Background

Plaintiff Earle Kelly worked for Defendants at the Roosevelt Roads Naval Station (Roosevelt Roads) in Ceiba, Puerto Rico from March 1981 through September 1996. Defendants are federal defense contractors who operated the MK–30 shop [2] for the Department of the Navy at Roosevelt Roads. Plaintiff Earle Kelly alleges that while employed by Defendants he performed duties as a weapons technician and a launch master. He alleges that due to overwork at his job, he developed two hernias and back problems. Plaintiff alleges that Defendants did not provide Plaintiff with the accommodation, including equipment and assistance needed to safely perform his tasks. Plaintiff alleges that he became aware that his employer was not complying with applicable federal and state employment laws and regulations. He claimed his proper benefits and informed other employees of their rights. Plaintiff alleges that because these actions, his employer "commenced a campaign of coercion, harassment, retaliation and discrimination against [him]." (Complaint, ¶ 25.) Plaintiff alleges that in June 1995 he applied for a promotion but was denied the promotion because of his age, disability, and workers' rights activity.

Plaintiff suffered another injury in July 1995. Plaintiff alleges that Defendants failed to pay him the proper disability benefits. The United States Department of Labor ordered Defendants to pay Plaintiff the proper benefits. In January 1996, Plaintiff was injured on the job again. Plaintiff was terminated in September 1996 based on the company's medical leave of absence policy.

## II. Plaintiffs' State Law Claims

### A. Exclusive Federal Legislative Jurisdiction in a Federal Enclave

Defendants allege that Puerto Rico law has no application to Plaintiff with regard to his employment with Defendants at Roosevelt Roads because the alleged discriminatory actions occurred solely in relation to Plaintiff Earle Kelly's employment at Roosevelt Roads, a federal enclave under the exclusive jurisdiction of the federal government.

■ A federal enclave is a portion of land over which the United States government exercises exclusive federal legislative jurisdiction.[3] The federal government obtains control over an enclave through one of three methods. Under the first method, the United States purchases land with the state's consent and the state transfers complete jurisdiction to the United States pursuant to Clause 17 of Section 8 of Article One of the United States Constitution. Under the second method, the federal government purchases land over which a state exercises jurisdiction. The state may cede some or all of its jurisdiction to the federal government after the purchase. Under the third method, the federal government reserves jurisdiction over portions of a state when the state enters the Union.

The United States obtained exclusive federal legislative jurisdiction over Roosevelt Roads through a series of events which has aspects of the first and second means of creating a federal enclave. These events are well described in Judge Pieras's recent decision in *Koren v. Martin Marietta Services., Inc.,* 997 F.Supp. 196, 199–202 (D.P.R.1998), and need not be repeated by this Court. *See also People of Puerto Rico v. Koedel,* 927 F.2d 662, 664–666 (1st Cir.1991) (reviewing exclusive jurisdiction of United States over Fort Buchanan, Puerto Rico). Suffice it to say, under the relevant events and laws, the United States obtained exclusive legislative

---

**2.** Plaintiffs' complaint suggests that this operation performed weapons maintenance.

**3.** Other forms of federal enclave jurisdiction exist but are not relevant to this decision.

jurisdiction over Roosevelt Roads through the consent of Puerto Rico and the agreement of the United States by 1955 at the latest.[4] *See Sopena v. Colejon Corp.*, 920 F.Supp. 259, 264 (D.P.R.1996) (Roosevelt Roads "fall[s] within the exclusive legislative jurisdiction of Congress").

■ "Whether federal enclave jurisdiction, a form of federal question jurisdiction, exists is a complex questions, resting on such factors as whether the federal government exercises exclusive, concurrent or proprietarial jurisdiction over the property, when the property became a federal enclave and what the state law was at that time, whether the law is consistent with federal policy, and whether it has been altered by national legislation." *Celli v. Shoell*, 40 F.3d 324, 328 n. 4 (10th Cir.1994) (citations omitted). The extent and application of *legislative* federal enclave jurisdiction form a similarly complex question resting on the same factors.

■ There are three theories as to the development of federal enclave law in relation to state law.[5] Under the first theory, when an area becomes a federal enclave, the local law in effect at the time of cession continues to apply until it is abrogated by federal law. *See James Stewart & Co. v. Sadrakula*, 309 U.S. 94, 100, 60 S.Ct. 431, 434, 84 L.Ed. 596 (1940); *Chicago, Rock Island & Pacific RR. v. McGlinn*, 114 U.S. 542, 546, 5 S.Ct. 1005, 29 L.Ed. 270 (1885). In effect, the state law at the time of cession becomes federal law. Only that federal law applies in the enclave unless Congress specifically makes a provision for the application of

law legislated by Congress. Under this theory, the status quo at the time the federal enclave became an enclave is maintained no matter how much time has passed since the creation of the enclave, unless Congress acts to change the status quo.[6] *Celli*, 40 F.3d at 328 n. 4. Under the second theory, the *Paul* rule, subsequent state regulatory changes consistent with the state law in place at the time of cession are applicable within a federal enclave. *Paul v. United States*, 371 U.S. 245, 269, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). Thus, the state/federal law is not frozen in time as of cession, but continues to develop as the state develops the law. Under the third regime, all state law rules of the state in which the enclave exists are applicable within the federal enclave unless they interfere with the federal government's jurisdiction. *See, e.g., Howard v. Commissioners of the Sinking Fund of the City of Louisville*, 344 U.S. 624, 73 S.Ct. 465, 467, 97 L.Ed. 617 (1953). Neither the United States Supreme Court nor the Court of Appeals for the First Circuit has determined which of these regimes apply under the present circumstances. In fact, in *Goodyear Atomic Corporation v. Miller*, 486 U.S. 174, 182, 108 S.Ct. 1704, 1710, 100 L.Ed.2d 158 (1988), the United States Supreme Court specifically bypassed deciding whether a state could directly regulate operations at a federal facility operated by a private contractor.

■ "It is well settled that activities on federal installations are shielded by the Supremacy Clause from direct regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." *Good-*

---

4. It is important to note that the United States obtained control of Roosevelt Roads *with the consent of Puerto Rico.* "When the federal government acquires land within a state without the consent of the state, the United States possesses as an ordinary proprietor and does not obtain the 'exclusive' benefits of Article I, § 8, Clause 17. [Footnote omitted.] Instead questions about congressional power over such property are resolved by reference to Article IV, § 3 of the Constitution which provides that '[t]he Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.' ... Laws of Congress designed to protect federal property interests prevail over contradictory state enactments." 3 Chester J. Antieau & William J. Rich, The States and the

Federal Government, *Modern Constitutional Law* (2d ed.1997).

5. *See* Michael J. Malinowski, *Federal Enclave and Local Law: Carving Out a Domestic Violence Exception to Exclusive Legislative Jurisdiction,* 100 Yale L.J. 189, 192–96 (1989); Stephen E. Castlen & Gregory O. Block, *Exclusive Federal Legislative Jurisdiction: Get Rid of It!,* 154 Mil. L.Rev. 113, 113–25 (1997).

6. The corollary of this theory is that if there is no relevant law in the surrounding state at the time the federal enclave gains enclave status, there is no law whose present-day relevance and applicability must be assessed.

*year Atomic Corp.,* 486 U.S. at 180, 108 S.Ct. at 1709. Of note, *"Hancock,* thus estab-lishe[d] that a federally owned facility per-forming a federal function is shielded from direct state regulation, even though the fed-eral function is carried out by a private con-tractor, unless Congress clearly authorizes such regulation." *Id.,* 486 U.S. at 181, 108 S.Ct. at 1710 (*citing Hancock v. Train,* 426 U.S. 167, 179, 96 S.Ct. 2006, 2012–13, 48 L.Ed.2d 555 (1976)). This rule is all the more applicable when the enclave is a facility of the United States Navy, and a private contractor performs only one of many federal functions on the base.

■ This Court finds that the application of either the first or second theory is most consistent with the language of the Constitu-tion and federal enclave jurisprudence. Ap-plication of either regime leads to the dis-missal of Plaintiffs' state law claims.[7] *See Celli v. Shoell,* 995 F.Supp. 1337, 1341–46 (D.Ut.1998) (state laws not enacted at time of cession of air force base were not applicable to employees of private employer at base); *Miller v. Wackenhut Servs., Inc.,* 808 F.Supp. 697, 699–700 (W.D.Mo.1992) (state antidiscrimination laws not applicable to em-ployee of private contractor on federal en-clave); *see also George v. UXB Int'l, Inc.,* 1996 WL 241624, at *3–*4 (N.D.Ca. May 3, 1996) (state wage and hours legislation not applicable to employment of employees of private contractor performing work at feder-al enclave). Plaintiffs allege claims under Puerto Rico laws which only came into effect after 1955. Puerto Rico's Law 100, 29 L.P.R.A. § 146 *et seq.* (Antidiscrimination statute) was promulgated in 1959, and Puerto Rico's Disability Discrimination statute was promulgated in 1985. 29 L.P.R.A. § 146 *et seq.;* 1 L.P.R.A. § 510 *et seq.* Puerto Rico first judicially recognized a cause of action by a spouse of a victim of discrimination in 1994. *Santini–Rivera v. Serv. Air, Inc.,* 94 J.T.S. 121. These causes of action under Puerto Rico law are primarily based on Law 100 of

1955.[8] Thus, the statutes and judicially rec-ognized causes of action under Puerto Rico law pleaded by Plaintiffs are not applicable to the federal enclave of Roosevelt Roads because they were not in effect at the time the United States accepted and exercised control over the base, and because there were no similar statutes in effect at such time.

■ Plaintiffs argue that state law has often been adopted for application on federal enclaves. This statement is correct; howev-er, some affirmative action by Congress to adopt such laws is necessary for them to be effective on the federal enclave. "[B]ecause the Supremacy Clause immunizes the activi-ties of the Federal Government from state interference, [citation omitted], direct state regulation of federal facilities is allowed only to the extent that Congress has clearly au-thorized such regulation." *Goodyear Atomic Corp.,* 486 U.S. at 179 n. 1, 108 S.Ct. at 1709 n. 1. In *Goodyear,* the Court allowed the application of a state workers compensation law because Congress had passed 40 U.S.C. § 290, which explicitly required the enforce-ment of state workers compensation laws on federal enclaves. No such statute has been passed to permit state antidiscrimination statutes to be enforced on federal enclaves. The case of *United States v. Sharpnack,* 355 U.S. 286, 293–94, 78 S.Ct. 291, 296–97, 2 L.Ed.2d 282 (1958), cited by Plaintiffs, is not to the contrary. In *Sharpnack,* the Supreme Court upheld the constitutionality of a feder-al statute that specifically made state crimi-nal laws applicable on federal enclaves. *See* 18 U.S.C. § 13. The resolution of the herein case turns not on whether Congress could constitutionally adopt, but whether Congress has adopted, such a law. Congress has made no such adoption with regard to local tort or discrimination laws.

Plaintiffs' effort to point out that federal antidiscrimination laws do not *preempt* state antidiscrimination laws misses the point of

---

**7.** This conclusion finds support in a recent deci-sion of the Puerto Rico Supreme Court in which the Court held that Puerto Rico's employment laws do not extend to Roosevelt Roads. *Renata Roberts v. U.S.O. Council of Puerto Rico,* 98 J.T.S. 27.

**8.** *Santini–Rivera* recognized a cause of action authorizing a third party to recuperate damages under Civil Code Article 1802 based on an under-lying Law 100 violation. Said cause of action did not exist in 1955 because Law 100 was only enacted in 1959.

the federal enclave doctrine. The focus of the analysis is not, as Plaintiffs suggest, whether state and federal law in this area can peacefully co-exist. This point resembles the *Howard* theory of federal enclave law mentioned above. The proper analysis considers whether either the state law existed at the time of cession and has not been abrogated by Congress, whether a relevant predecessor state law existed, or whether Congress has specifically acted to make state law Applicable on the enclave.

The dismissal of Plaintiffs' state law claims is favored by a consideration of the practicalities underlying the practice of maintaining federal enclaves. First, the Congress maintains exclusive legislative control over the federal enclaves so that the Congress can exercise sole control over the federal functions performed within the enclaves. This power was considered so significant by the Founding Fathers that the power is reserved to Congress in the Constitution, U.S. Const., Art. I, § 8, cl. 17, and was upheld in an early Supreme Court case, *McCulloch v. Maryland*, 4 Wheat. 316, 4 L.Ed. 579 (1819). In the case at bar, Plaintiffs bring their case as a discrimination and tort action between Plaintiffs and Defendant defense contractors. At first blush, this may seem to be an action that does not implicate federal functions and instead one which might appropriately be subject to state regulation of the employer-employee relations involved. The substance of Plaintiffs' complaint, however, effects the way in which Defendants operated the maintenance shop for military equipment at Roosevelt Roads. For instance, Plaintiffs allege that Defendants failed to provide him with the equipment needed to perform his duties properly. Such an allegation implicates the way in which Defendants provide defense maintenance services required by the United States navy. By excluding state law coverage of these activities, the federal government can exercise control over the standards by which such tasks are performed, free of state law interference. Second, Plaintiffs are not left without remedy. Federal statutes such as ADEA and ADA provide a source of relief for Plaintiffs. Third, maintaining both state and federal claims in this case would be complicated because federal and Puerto Rico antidiscrimination statutes have different standards of proof. *See Vera–Lozano v. International Broadcasting*, 50 F.3d 67, 70 (1st Cir.1995); *Menzel v. Western Auto Supply Co.*, 848 F.2d 327, 330–31 (1st Cir.1988); *DeArteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 943 (1st Cir.1988); *Dominguez v. Eli Lilly & Co.*, 958 F.Supp. 721, 741 (D.P.R. 1997).

■ Plaintiffs emphasize that Plaintiff Earle Kelly worked for a private corporation, not the United States. Plaintiffs argue that Defendants are subject to local law because Mr. Kelly was an employee of a private corporation performing work on a federal enclave, rather than as a federal employee. Plaintiffs argue, "This is an important distinction since, not acknowledging it would lead to the undesirable and senseless conclusion that a contractor such as [Defendants] would be allowed to ignore the labor laws of Puerto Rico with respect to its employees within a Puerto Rico federal enclave but it would be bound by the same with respect to its Puerto Rico employees outside of a federal enclave, if any." (Docket No. 19, at 4.) Under Plaintiffs' scheme, a corporation conducting work on a federal enclave would have to know with whom each person with whom it dealt was employed, because each person might be subject to a different legal regime depending upon whether that person was based on or off the enclave. The present scheme is simpler to administer and more practical. It is the fact that a cause of action arises on a federal enclave, and not for whom the cause of action arises, that determines that the law of the enclave is applicable. *See Goodyear*, 486 U.S. at 179–85, 108 S.Ct. at 1709–12 (under Supremacy Clause, state law not applicable to a private employee at a federal installation run by private contractor unless Congress passed legislation making such law applicable).

■ Plaintiffs' resort to the Service Contract Labor Act, 41 U.S.C. § 351, is unavailing. Plaintiffs state that "[t]his disposition acknowledges the obligation of contractors of the U.S. to comply with local labor laws within federal enclaves." (Docket No. 14, at

5.) This Court disagrees. This statute requires service contractors working for the United States to comply with local minimum wage, fringe benefit, safety and notification laws. It does not incorporate local labor, tort, or discrimination law into federal service contracts.

The Court therefore dismisses all of Plaintiffs' Earle Kelly, Paige Kelly and their conjugal partnership's state law claims.

## B. Federal Enclaves and 16 U.S.C. § 457

■ Plaintiff Paige Kelly claims that her cause of action for mental anguish because of discrimination against her husband survives because 16 U.S.C. § 457 allows actions to be brought "to recover on account of injuries sustained in any such place [a federal enclave or national park] the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be." [9] Plaintiff Paige Kelly asserts that Congress has by statute incorporated local law into the laws covering the federal enclave of Puerto Rico.

It is unclear from a cursory reading of the statute what constitutes "injuries" under this statute. The first part of the statute specifically references actions which would serve as a basis for a civil action based on a person's death-that is, a death caused "by the neglect or wrongful act of another". The clause of the statute related to "injuries" contains no explicit limitations as the kind of "injuries" for which the statute provides relief.[10] Two interpretations of the second clause are possible, one broad, the other narrow. First, Congress meant to incorporate relevant state law for all causes of action related to "injuries" occurring on the enclave. Second, the "injuries" in the statute refer to only to physical injuries.

A review of the legislative history confirms the narrow construction. With the passage of this statute, Congress intended to provide relief to certain persons suffering physical injury, or possessing causes of action related to another's physical injury, in federal enclaves. Congress enacted 16 U.S.C. § 457 in order to eliminate a historical anomaly. At common law, a person's cause of action died with him or her. Therefore, there was no cause of action for a wrongful death occurring on most federal enclaves. The British Parliament enacted Lord Campbell's Act in 1846 to permit wrongful death actions. Lord Campbell's Act

> provides that whenever the death of any person is caused by the wrongful act, neglect or default of another, in such a manner as would have entitled the party injured to have maintained an action in respect thereof if death had not ensued, an action may be maintained if brought within 12 months after his death in the name of his executor or administrator, for the benefit of certain relatives, and that the jury may give such damages as they may think have resulted to the respective persons for whose benefit the action is brought, and the damages so recovered, after deducting the costs not recovered from the defendant, shall be divided among the beneficiaries in such shares as the jury by their verdict may direct.

(9 & 10 Vict.Ch. 93 (1846). 22A AmJur.2d *Death* § 6 (1988 & 1997 Supp.). In the mid-nineteenth century, American states began to adopt their own versions of Lord Campbell's Act. Nonetheless, even in the twentieth century, the law in effect on many federal enclaves was the common law, rather than the American versions of Lord Campbell's law. 22A AmJur.2d *Death* § 7 (1988 & 1997 Supp.). Without reform, the families of

---

9. The statute in its entirety reads:
   **Action for death or personal injury within national park or other place under jurisdiction of United States; application of State laws.** In case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the Untied States, within the exterior boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State

within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be. 16 U.S.C. § 457.

10. The title of the statute states "personal injury".

those who had suffered wrongful death on a federal enclave could achieve no legal redress. Passage of 16 U.S.C. § 457 allowed a means for redress for wrongful death. It also permitted a cause of action for physical injury, which already existed at common law.

The only substantive legislative history of the bill which was codified at 16 § U.S.C. 457 bears out this understanding of the statute:

Actions for Death or Personal Injury

The bill (S.1798) concerning actions on account of death or personal injury within places under the exclusive jurisdiction of the United States was considered in the Committee of the Whole and was read, as follows: *Be it enacted, etc.,* That in the case of the death of any person by the neglect or wrongful act of another within a national part or other place subject to the exclusive jurisdiction of the United States, within the exterior boundaries of any State, such rights of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any such action brought to recover on account of injuries sustained in any such place the right of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

MR. ROBINSON of Arkansas. I think there should be an examination of the bill.

MR WALSH of Montana. A similar bill has passed the Senate many times, at least three or four, but for some reason or other, it has not succeeded in securing the approbation of the House. It is intended practically to make the application of what is known as Lord Campbell's Act to places within the exclusive jurisdiction of the United States.

Practically every State has now given a right of action to the legal representatives of the dependent relative of one who has suffered a death by reason of the neglect or wrongful act of another, there being no such recovery, it will be recalled, at common law.

There are a great many places in the United States under the exclusive jurisdiction of the United States—the national parks for instance. If a death should occur within those places, within the exclusive jurisdiction of the United States, there would be no right of recovery on the part of the representatives or dependents of the person who thus suffered death as a result of the wrongful act or neglect of another.

In the State of the Senator, I suppose a right of action is given by the act of the Legislature of the State of Arkansas to the representatives of one who thus suffers, but if the death occur within the Hot Springs Reservation, being entirely within the jurisdiction of the United States, no recovery could be had, because recovery can be had there only by virtue of the laws of Congress. The same applies to the Yellowstone National Park in Wyoming and the Glacier National Park in Montana.

MR. ROBINSON of Arkansas. This act would make the State law applicable?

MR. WALSH of Montana. It would; so that if under the law of Arkansas a right of recovery could be had if the death occurred outside of the national park, the same right of action would exist if it occurred in the national park.

MR. BRUCE. In other words, as I understand it, it is intended to meet the common-law principle that a personal action dies with the death of the person?

MR. WALSH of Montana. Exactly.

MR. ROBINSON of Arkansas. I have no objection.

The bill was reported to the Senate without amendment, ordered to be engrossed for a third reading, read the third time, and passed.

2116 Congressional Record Senate January 27, 1928.

If this statute were to mean what Plaintiffs claim it means, it would make all local tort laws applicable to federal enclaves. Such an interpretation would negate much of more than sixty years of federal enclave jurisprudence because it would have been unnecessary to evaluate what law applied on the enclave—as the Court had done above-because state law would have applied without question. The narrow interpretation of the statute makes more sense. In enacting this statute, Congress meant to provide relief for

death or personal—that is, physical—injuries caused by the neglect or wrongful act of another in a federal enclave. Under this reading, the two clauses of the statute are linked in their purpose of providing relief for persons physically harmed in federal enclaves.

Absent clear Congressional intent to enact an expansive statute, this Court cannot find that the term "injury" in this statute to include injuries to plaintiffs' self-respect, and emotional and mental well-being such as those alleged by Plaintiffs. Paige Kelly's claims under Puerto Rico law as applicable at Roosevelt Roads under 16 U.S.C. § 457 are therefore dismissed.

### III. Failure To Exhaust Administrative Remedies

Defendant alleges that Plaintiff Earle Kelly has failed to exhaust his administrative remedies as required by ADEA. In his complaint, Mr. Kelly does not allege that he filed the necessary charge with the Equal Employment Opportunity Commission, nor did he raise the issue of age discrimination before the Department of Labor. 29 U.S.C. §§ 626(d), 633(b); *Powers v. Grinnell Corp.,* 915 F.2d 34, 37 (1st Cir.1990). The Court therefore dismisses Plaintiffs' claim under ADEA.

### IV. Supplemental Jurisdiction

Defendant's request for the non-exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 is moot. The Court has determined that Plaintiffs cannot assert such claims because state law was not applicable to Plaintiff Earle Kelly's employment at Roosevelt Roads.

### V. Conclusion

Based on the above, the Court hereby GRANTS Defendants' motion to dismiss. The Court DISMISSES with prejudice all of Co–Plaintiff Earle Kelly's Puerto Rico claims and ADEA claims, all of Paige Kelly's claims, and all of the conjugal partnership's claims.

IT IS SO ORDERED.